OPINION OF THE COURT
Carol H. Arber, J.
In this action commenced pursuant to CPLR article 78, the petitioners Inner City Press/Community on the Move, Inc. *903 (ICP) and Matthew Lee, the Executive Director of ICP, and Fritz Jacques, a member of ICP, move for a preliminary injunction.
Petitioner ICP, on behalf of its membership, challenges a determination made by the New York City Department of Housing Preservation and Development (NYC HPD), the City Council and the Mayor (the Municipal Respondents) pursuant to New York State’s Urban Development Action Area Act (UDAAA) (General Municipal Law §§ 690-698), and the City’s Vacant Buildings Program to award a Land Disposition Agreement for four City-owned buildings in the South Bronx (Bronx Site 11 A) to Croton(a) Housing Associates (CHA).
Intercity Press/Community on the Move, Inc. is a domestic corporation incorporated under the State of New York’s Not-For-Profit Corporation Law. ICP estimates that it has over 1,000 members residing throughout the City, although it concedes that the majority of its members reside in the South Bronx and Upper Manhattan (e.g., Washington Heights). ICP’s certificate of incorporation provides that one of its purposes is to combat community deterioration in the economically distressed neighborhoods of New York City. In addition, the certificate states that ICP’s purpose is to "assist and foster the rebuilding and preservation of deteriorating neighborhoods of New York City” and assist individuals in their eiforts "to locate, purchase and restore to habitable condition abandoned residential buildings” and to "[e]ncourage and assist participation by such individuals and families in the planning of housing, economic development, and community development programs”.
ICP moves for an order pursuant to CPLR 7805 granting a stay and temporary restraining order to prevent the City from transferring Bronx Site 11A to CHA while ICP’s CPLR article 78 proceeding is still pending. The City opposes the motion.
General Municipal Law §§ 690 to 698, known as the Urban Development Action Area Act, provides municipalities with the power to dispose of abandoned buildings that have been acquired through tax and other forfeitures "to provide incentives for the * * * clearance, replanning, reconstruction, redevelopment, rehabilitation, restoration or conservation” of such buildings through "the undertaking of public and private improvement programs * * * and the encouragement and participation in these programs by private enterprise.” (General Municipal Law § 691.) In turn, UDAAA’s general state *904 ment of policy and purpose provides that "it must be the public policy of each municipality * * * to take such initiatives as are appropriate to effect [the] participation * * * of enterprises experienced in the construction of one to four family residential structures”. (Id., § 691.)
In turn, UDAAA in conjunction with the City’s Vacant Buildings Program is intended to authorize the City to dispose of City-owned buildings thereby adding to the currently limited supply of low- and moderate-income housing by permitting the City to transfer City-owned abandoned buildings to developers in exchange for agreement to rehabilitate these properties and to provide affordable housing for low- and moderate-income New Yorkers. (See, General Municipal Law §§ 690-694.)
In meeting the above goals, UDAAA requires that a project proposal must first be considered by the relevant local commission charged with planning and land use within the municipality after public hearings held on due notice. (See, General Municipal Law § 692 [7]; §§ 693, 694 [3].)
In addition to the above, UDAAA requires that an approval of a proposal "shall be in conformance with the standards and procedures required for all land use determinations pursuant to general, special or local law or charter.” (General Municipal Law § 694 [5].) Concerning the sale of property owned by the City, section 384 (b) of the New York City Charter provides in relevant parts that:
"1. The mayor may authorize the sale * * * only for the highest marketable price * * * at public auction or by sealed bids and after advertisement for at least thirty days in the City Record * * * No such sale * * * shall be authorized until a public hearing has been held with respect to such sale or lease after the publication of notice in the City Record at least thirty days in advance of such hearing. * * *
"3. Real property of the city may be sold only after [an] appraisal made within six months prior to the authorization of the sale and after a review of such appraisal by the department of general services within thirty days prior to authorization of the sale, provided that advertisement for the public auction for such sale shall be commenced within sixty days of such authorization.”
In turn, chapter XI of the Rules of the City Council for the City of New York (the City Council or the Council) contains the rules pertaining to the City Council’s Land Use Commit *905 tee. Concerning public hearings, section 11.40 of the Rules of the Council provides in relevant part that: "c. The Land Use Committee and its subcommittee shall make available to all Council members the record of all public hearings of the committee and its subcommittees with respect to matters referred to the committee pursuant to section 11.20 [which refers land use disposition matters before the Council to the Land Use Committee].”
Moreover, before UDAAA-designated property may be sold by the City, UDAAA requires that the Mayor must approve the buyer "as a qualified and eligible sponsor in accordance with established rules and procedures prescribed by the agency.” (General Municipal Law § 695 [2] [a].) With respect to the transfer of City-owned vacant buildings the City relies upon a generic Request for Proposals (RFP) issued by the New York City Department of Housing Preservation and Development under the City’s Vacant Buildings Program. NYC HPD relied upon this generic RFP in soliciting bids for Bronx Site 11A beginning on July 2, 1991.
Part I of the RFP provides in relevant parts that: "The purpose of this [RFP] is to solicit proposals for rehabilitation and ownership of vacant, City-owned buildings to create new housing for low-and-moderate-income and homeless New Yorkers * * * The City has determined to redirect its housing programs to better target assistance towards lower income residents who are most in need of housing. The Vacant Building Program has therefore been redesigned to reduce overall rent levels, to create a larger proportion of units for low-income residents, and to reserve a portion of the units for homeless residents.”
Part III of the RFP, concerning the conditions placed upon RFP response submissions, provides that "[a]fter submission, HPD will not request or accept additions or changes to Attachment B.” (RFP, part III.A., C.)
Part IV of the RFP, concerning the distribution of apartments in a bid proposal for what NYC HPD terms an "80/10/ 10” site, such as Bronx Site 11 A, provides in relevant part that: "In these sites, 10% of the units * * * are required to be offered at rents affordable to homeless households * * * a minimum number of 10% of the units * * * are to be offered at rents affordable to low-income households * * * remainder at rents affordable to moderate-income households”. (RFP, part IV.B.)
*906 Moreover, Part IV of the RFP, concerning applicable rent and income limits, provides that the maximum monthly rents for low-income units are standard City-wide, and are as follows by unit size: zero bedrooms — $275; one bedroom — $335; two bedrooms — $400; and three bedrooms — $475. In turn, the maximum monthly rents for the units are set at the rates prescribed for public assistance shelter rents, which are: zero bedrooms — $215; one bedroom — $286; two bedrooms — $312; and three bedrooms — $349. (RFP, part IV.D.) Moreover, "[t]he household incomes of low-and-moderate-income tenants at the signing of their first leases shall not exceed four (4) times the annual rents specified for their units.” (RFP, part IV.E.) In addition, "thirty percent (30%) of the units, not including units for the homeless, must be set aside for residents of the community District in which the project is located.” (RFP, part IV.I.)
Part V of the RFP, concerning selection criteria threshold requirements for bidders, provides that "[proposals which fail to meet the threshold criteria will be rejected.”
Part V of the RFP requires that "[e]ach proposal must include a letter from a private institution indicating the total number of units that institution would be willing to finance for the individual site.” (RFP, part V.A.ll.) Part VI.A. Tab 1 provides that "[e]ach proposal must include a letter from a lending institution indicating a willingness to lend for the project and specifying the amount they are willing to consider financing”.
Part V of the RFP provides that a developer will be rejected if found to be in arrears or if there is extensive evidence of building violations or litigation history against properties owned and managed by it. (RFP, part V.A.13.)
Croton(a) Housing Associates is a private for-profit partnership formed by six individuals, for the purpose of submitting a bid under the City’s Vacant Buildings Program to purchase the four City-owned buildings at a South Bronx site identified as Bronx Site 11 A. The partners in CHA are also the principals in two for-profit real estate development and management concerns, Ralph Langam Associates and Kay Management Group, which own or manage a number of residential buildings in the South Bronx, Harlem and Brooklyn.
Sometime in 1991, CHA responded to the RFP for Bronx Site 11A issued by NYC HPD pursuant to the City’s Vacant Buildings Program. In "Attachment B” of its RFP response *907 CHA represented that it would rehabilitate the four buildings identified as Bronx Site 11A and create 79 low-income rental units (out of a total of 89 units).
In January 1992, Croton(a) Housing Associates was selected by NYC HPD as a sponsor under the Vacant Buildings Program to rehabilitate Bronx Site 11A. Under the terms of the Land Disposition Agreement, the City agreed to sell Bronx Site 11A to CHA for $500 per unit (or a total acquisition cost of $44,500), while the City would grant CHA $500,000 and loan them $3.7 million at a favorable interest rate for a 30-year period.
Following NYC HPD’s selection of CHA as a sponsor and prior to holding public hearings, CHA informed the City that it would reserve only 9 rental units instead of 79 units for low-income families and 8 rental units for homeless families after rehabilitating the buildings at Bronx Site 11A. Together the number of units designated for low-income and homeless families total only 19% of the total rental units in the buildings at Bronx Site 11 A. The remainder of the rental units are slated to go to middle-income families with annual family incomes between $13,400 and $36,000.
In October 1992, ICP learned from the City Record of September 25, 1992 that (i) NYC HPD had selected a number of City-owned buildings in the South Bronx for a proposed UDAAA project, and (ii) NYC HPD had selected CHA as a project sponsor pursuant to UDAAA and the City’s Vacant Buildings Program to acquire and redevelop the four buildings comprising Bronx Site 11 A.
ICP learned that there would be a public hearing held by the City Council’s Land Use Committee in early January of 1993. When NYC HPD did not provide the documents in response to ICP’s FOIL request (Freedom of Information Law; Public Officers Law art 6), ICP filed a CPLR article 78 petition in this court asking the court to compel NYC HPD to comply with ICP’s FOIL request for documents. On January 29, 1993, this court issued an order compelling NYC HPD to comply with ICP’s FOIL request for relevant documents. Shortly thereafter NYC HPD complied with ICP’s FOIL request.
On January 13, 1993, while the above FOIL litigation was still pending, the Mayor held a public hearing to approve the disposition of the buildings comprising Bronx Site 11A and to approve CHA as a qualified and eligible sponsor in accordance with established rules and procedures prescribed by the agency as required by UDAAA.
*908 On February 9, 1993, the City Council’s Land Use Committee held a public hearing on the proposed disposition of Bronx Site 11A and took testimony from Matthew Lee, the Executive Director of ICP, and some 20 members of ICP. ICP members presented documents and testimony at the February 9, 1993 public hearing to the effect that: (1) CHA partners both individually and through other partnerships own buildings with over 8,075 outstanding Housing Maintenance Code violations; (2) CHA partners both individually and through other partnerships own buildings with substantial tax arrearages to the City; (3) NYC HPD’s Department of Investigation had not provided a "clearance” letter in relation to the disclosure documents submitted to NYC HPD by the CHA partners, in July of 1992; (4) some of the CHA partners, through other partnerships, have at least two outstanding bank foreclosure actions pending against them for defaulting on current mortgages; (5) KMG, a real estate management partnership comprised of some of the CHA partners, was under investigation by NYC HPD for mismanagement of several buildings in Brooklyn (where the local community board had informed NYC HPD that it opposed a proposal to give KMG ownership of these same buildings); and (6) NYC HPD had allowed some development teams to change both their membership and their construction cost estimates after submitting their formal responses to NYC HPD’s RFP. Contrary to the requirements of NYC HPD, CHA failed to produce a firm financing commitment letter for approval. In addition, petitioner Lee pointed out that CHA was not the low bidder for the Bronx Site 11A project and that it had substantially altered its project proposal after being selected as a sponsor by NYC HPD (e.g., raising the proposed rent levels and drastically lowering the number of rental units to be provided for low-income families from 79 to 9).
On February 22, 1993, the full City Council met to vote on NYC HPD’s proposed sale of Bronx Site 11A to CHA. In spite of the Council rule requirement of a transcript, this meeting took place before a written transcript of the February 9, 1993 public hearing held by the Land Use Committee had been prepared.
In addition, the proposal concerning Bronx Site 11A was coupled with numerous other items as the general orders of the day (i.e., requiring one "yea” or "nay” vote on the entire list of matters presented). Nonetheless, four Council members voiced their concerns over the proposed sale of Bronx Site 11A *909 to CHA. However, these Council members had no transcript of the February 9, 1993 Land Use Committee’s public hearing to assist in sorting out their concerns. Ultimately, NYC HPD’s proposal for Bronx Site 11A was passed by the Council, with two Council members voting against the proposal and two Council members abstaining.
After the February 22, 1993 vote by the City Council concerning Bronx Site 11 A, ICP inquired as to the date of the mayoral public hearing concerning the disposition of Bronx Site 11A as required by UDAAA. The office of the Mayor initially declined to provide this information to ICP and directed ICP to contact NYC HPD. Subsequently, NYC HPD informed ICP that the mayoral public hearing had already taken place on January 13, 1993, and that no one attended or testified and that the relevant administrative record was now closed. NYC HPD also informed ICP that the required mayoral approval documents were awaiting signatures from the City Council and the Mayor. On March 16, 1993, Deputy Mayor Fife, on behalf of the Mayor, approved the proposed sale of Bronx Site 11A to CHA.
On June 16, 1993, the Mayor held a new public hearing concerning the proposed transfer of Bronx Site 11A to CHA. In turn, on June 28, 1993, Deputy Mayor Fife provided the Mayor’s approval to the proposed sale of Bronx Site 11A to CHA.
Petitioners then commenced the instant CPLR article 78 proceeding, challenging the determination made by NYC HPD, and the sale to CHA. ICP now moves for an order pursuant to CPLR 7805 for a stay and to restrain the City from transferring Bronx Site 11A to CHA while the instant CPLR article 78 proceeding is pending. The City opposes the motion.
In order to be entitled to a preliminary injunction, the moving party must demonstrate (1) a likelihood of success on the merits, (2) irreparable injury if provisional relief is not granted, and (3) that a balancing of the equities demonstrates that the moving party is entitled to injunctive relief. (Preston Corp. v Fabrication Enters., 68 NY2d 397 [1986].)
A governmental entity’s serious substantive and procedural violations of applicable laws are in and of themselves sufficient to establish a likelihood of success on the merits. Williams v City of Schenectady (115 AD2d 204) involves a similar set of facts. The City of Schenectady attempted to purchase a *910 parcel of land without first obtaining a mandated permit from the Department of Environmental Conservation for purchase of such parcel. While the City claimed that this particular transaction was exempt from the requirement, the Court disagreed and granted plaintiffs petition for a preliminary injunction barring the transaction based on a holding that: "[t]he strong likelihood of plaintiffs ultimate success in this regard amply supports the conclusion of Special Term that the statute * * * will be violated if the purchase without a permit is consummated. Such a showing is sufficient to support the grant of a preliminary injunction to plaintiff’ (supra, at 205).
In the present case, petitioners claim that the City’s transfer of title of Bronx Site 11A to CHA is in violation of numerous legal requirements, to wit: (1) the Mayor’s public hearing to approve CHA was held out of the sequence provided for by UDAAA; (2) the full City Council met to vote without the required written transcript of the public hearing; (3) CHA partners, individually and through other partnerships, own buildings with substantial Housing Maintenance Code violations which require that they be rejected as bidders for ownership of vacant, City-owned property; and (4) NYC HPD and the Mayor decided to sell Bronx Site 11A to CHA before there was an appraisal of the property as required by section 384 of the New York City Charter.
Respondents fail to dispute petitioner ICP’s allegations but argue that petitioners lack standing to bring this CPLR article 78 on the ground that the violations were de minimus. By decision dated February 10, 1994, this court has found that petitioners have standing to prosecute this CPLR article 78 proceeding, and based upon the violations enumerated, petitioners have established a likelihood of success on the merits.
Petitioners must also demonstrate irreparable injury in order to justify the granting of provisional relief. As demonstrated by their affidavits, members of ICP are in need of affordable and decent housing in their neighborhood. UDAAA and the City’s Vacant Buildings Program are intended to address and to ameliorate these needs. However, petitioners have offered evidence to show that CHA intends to provide fewer units of low-income housing at Bronx Site 11A than required in the RFP, or than CHA initially promised in "Attachment B” of its response to the RFP. CHA’s change in the number of units violates part III of the RFP.
Accordingly, if the City is permitted to transfer Bronx Site 11A to CHA in violation of the terms of the RFP and in *911 contravention of the criteria upon which CHA was initially selected by NYC HPD, low-income and homeless members of ICP and their families will lose a number of units of publicly financed affordable housing in their neighborhood.
Moreover, based on the evidence presented by petitioners of CHA’s outstanding Housing Maintenance Code violations and mortgage and tax arrearages, the potential residents of the buildings comprising Bronx Site 11A face the reality that the affordable housing mandated to be provided for them by CHA will in the end be neither affordable nor habitable. Clearly, the selection criteria in the RFP that disqualify applicants with extensive Housing Maintenance Code violations and mortgage arrearages are intended to guard against that result. Given the concerns regarding CHA’s questionable management record at other residential buildings, it is also questionable whether the principals of CHA can be relied on to maintain the buildings at Bronx Site 11A in a safe and habitable condition. Any such neglect portends serious potential harm to ICP members who are tenants in nearby buildings.
Based on the foregoing, petitioners have demonstrated that they will be irreparably harmed by the transfer of the building comprising Bronx Site 11A by the City to CHA.
Finally, petitioners are required to show that a balancing of the equities demonstrates that they are entitled to injunctive relief.
Both UDAAA and the City’s Vacant Buildings Program seek to encourage the development of safe, affordable, moderate- and low-income rental units with mandated public input into any development decisions made by public officials. Based upon the record before this court, petitioners have made a clear showing that these important public policy goals would be violated if CHA is permitted to proceed prior to a determination of this CPLR article 78 proceeding.
In addition, public policy concerns underlying UDAAA, the City’s Vacant Buildings Program, and other applicable City laws, favor granting ICP injunctive relief to enjoin the City from transferring title to Bronx Site 11A to CHA. (See, e.g., Matter of Mangum v Sanguedolce, 58 Misc 2d 37 [Monroe County 1968] [the basic public policy rationale behind a statute mandated that any possible financial distress of the respondent be subordinated to the paramount public interest embodied in the statute].)
*912 In opposition to the injunctive relief, respondents rely on the fact that the buildings have been gutted and the financing is in place. Any delays they argue will jeopardize completion of the project.
In making these arguments, respondents fail to address the substance of petitioners’ claims, to wit: that when finished the units will not be available to those for whom they were intended. For the most part respondents devote their response to attacking petitioners rather than responding to the specific allegations that they raise.
Based on petitioners’ ample proof that respondents have committed substantive and procedural violations, the balance of equities tips in favor of granting petitioners a stay.
Accordingly, the Municipal Respondents shall refrain from taking any further action with regard to Bronx Site 11 A, all work being done at the site shall cease forthwith, pending the resolution of this CPLR article 78 proceeding.
While petitioners have amply demonstrated that they are entitled to a preliminary injunction, this court shall conduct a hearing to determine if it was reasonable for the respondents to waive, modify or accelerate applicable substantive and procedural City laws when the respondents made their determination to transfer Bronx Site 11A to CHA.
[Portions of opinion omitted for purposes of publication.]